UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rashid Arraleh,

    Plaintiff,

v.                                                                                                  Civ. No. 03-6209 (JNE/AJB)
                                                                    ORDER
County of Ramsey and
Terry Zurn, individually,

    Defendants.

---

Leslie L. Lienemann, Esq., Culberth, Lienemann & Stratton, LLP, appeared for Plaintiff Rashid Arraleh.

Stephen P. McLaughlin, Esq., Assistant Ramsey County Attorney, appeared for Defendants County of Ramsey and Terry Zurn.

---

Rashid Arraleh brought this employment discrimination action against his former employer, Ramsey County (the County), and his supervisor, Terry Zurn, in his individual capacity (collectively, Defendants), asserting claims under Title VII of the Civil Rights Act (Title VII), 42 U.S.C. §§ 2000e to 2000e-17 (2000); 42 U.S.C. § 1981 (2000); and the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01-.41 (Supp. 2003). The case is before the Court on Defendants' motion for summary judgment. For the reasons set forth below, the Court grants the motion.[1]

## I.  BACKGROUND

Arraleh is a black immigrant from Somalia. In December 2001, Arraleh was hired as a temporary Employment Guidance Counselor at Workforce Solutions, a department of the

---

[1] Defendants also move to strike from the pleadings and exclude evidence of claims for damages on the ground that Arraleh failed to produce medical records in compliance with a prior Order of the Court. Because the Court grants Defendants' motion for summary judgment, the Court denies Defendants' motion for sanctions as moot.

County. His position was scheduled to expire on May 31, 2002. Nonetheless, Arraleh accepted the position with the hope that he would obtain a permanent position at Workforce Solutions.

At all times relevant to this litigation, the County's temporary employees were allowed to apply for permanent positions that became available and were not filled internally. When a department or program had an open permanent position, it would submit a request to the County's Human Resources Department (Human Resources) for a "list of eligibles." These lists, generated independently by Human Resources, contained the names of the top applicants based on points awarded for application-question responses and test scores. The department or program seeking the list, in this case Workforce Solutions, was required to hire individuals appearing on these lists.

During and shortly after Arraleh's tenure at Workforce Solutions, it requested four lists of eligibles from Human Resources. On January 29, 2002, Human Resources produced a list of eligibles to fill four Employment Guidance Counselor openings. Arraleh's name did not appear on the list. On May 13, 2002, Workforce Solutions received an updated list of eligibles to fill one Employment Guidance Counselor position. Again, Arraleh's name did not appear on the list. Two weeks later, on May 28, 2002, Workforce Solutions requested a third updated list to fill two Employment Guidance Counselor Aide positions. This time, Arraleh's name did appear on the list; he ranked sixth out of thirteen eligible candidates. On June 17, 2002, he was interviewed by Terry Zurn and Bruce Heinz. Finally, on June 3, 2002, Human Resources supplied Workforce Solutions with a fourth updated list of eligibles for an open Employment Guidance Counselor position. Arraleh's name appeared on this list; he ranked second out of four applicants. He was not interviewed for this position.

Although Arraleh's name appeared on two lists of eligibles, he was not selected for either of the corresponding two open Employment Guidance Counselor Aide positions or the single Employment Guidance Counselor position.  Instead, Workforce Solutions awarded the Employment Counselor Aide positions to two African-American women, Sharron Gates and JoAnn Mays, who ranked eighth and tenth on the third list, respectively.  Workforce Solutions awarded the Employment Guidance Counselor position to an African-American male, Walter Rhodes, who ranked fourth on the final list of eligibles.

On May 31, 2002, Arraleh's temporary appointment expired and his employment at Workforce Solutions ended.  Approximately two weeks before his appointment expired, he complained to the Director of Workforce Solutions, Patricia Brady, that he believed he was being discriminated against on the basis of his race and that his work environment was racially hostile.  At Brady's request, Arraleh submitted a written complaint shortly thereafter.  Brady communicated Arraleh's concerns to Human Resources Generalist George Hamm, who subsequently scheduled an exit interview with Arraleh to investigate Arraleh's allegations.  Arraleh cancelled the meeting and did not reschedule it.

On April 7, 2003, Arraleh filed a charge of discrimination with the Minnesota Department of Human Rights and the Equal Employment Opportunity Commission (EEOC).  Arraleh received his EEOC notice of right to sue on September 8, 2003, and his Minnesota Department of Human Rights notice of right to sue on October 7, 2003.  He commenced this lawsuit on November 21, 2003, alleging that the County declined to hire him for continued employment on the basis of his race, national origin, and in retaliation for the complaint he made to Brady.  He also alleges that he experienced a hostile work environment.

## II.   DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.   Failure to Hire on the Basis of Race and National Origin**

Arraleh first alleges that the County declined to hire him for continued employment on the basis of his race and national origin. He maintains that he has presented direct evidence of Defendants' discrimination. Direct evidence is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (internal quotations omitted). Under Title VII, "[a] plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury . . . ." *Id.*

Arraleh asserts that two statements made by the County's employees are direct evidence of Defendants' discriminatory attitude. First, according to Arraleh, Zurn stated that he found it difficult to work with black men. To be considered on summary judgment, evidence must be admissible. *See Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 728 (8th Cir. 2001). Hearsay evidence not falling within an exception is not admissible. *See id.* In this case, the only evidence in the record that Zurn made the comment is Arraleh's deposition testimony that Zurn made the comment to co-worker Donna Waldhauser. Arraleh did not himself hear the comment, and Waldhauser's affidavit does not aver that Zurn made the comment. Arraleh's deposition testimony is, therefore, inadmissible hearsay. In the absence of competent evidence that the alleged statement was made, the Court disregards it.

Next, Arraleh asserts that a County Planner told Zurn that "[g]iving [Arraleh] a job is like raising terrorist kids." Arraleh has not, however, offered any evidence that this Planner was a decisionmaker with respect to Arraleh's employment at the County. Nor has he offered any evidence that Zurn or any other decisionmakers endorsed this view. Therefore, it is not direct evidence of discrimination. *See Griffith*, 387 F.3d at 736.

A plaintiff who is unable to put forth direct evidence of discrimination must create "the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis." *Id.* The first step in the *McDonnell Douglas* analysis is for the plaintiff to demonstrate a prima facie case of discrimination. 411 U.S. 792, 802 (1973). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant meets this burden, the final step is for the plaintiff to show that the proffered nondiscriminatory reason is a pretext for discrimination. *Id.* at 804-05.

*1.     Prima facie case*

To establish a prima facie case of race or national origin discrimination, Arraleh must show that: (1) he belongs to a protected class; (2) he applied and was qualified for the position in question; (3) there was an adverse employment action; and (4) some evidence of record supports an inference of unlawful discrimination. *See id.* at 802; *Johnson v. AT & T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005) (Title VII and § 1981 analysis the same). The parties agree that Arraleh, a black Somalian, is a member of a protected group and that he suffered an adverse employment action.

The parties dispute whether Arraleh was qualified for a position at Workforce Solutions. When analyzing this element of Arraleh's prima facie case, the Court does not simply examine Arraleh's ability to perform his job. *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000). "Rather, [Arraleh] must demonstrate that [he] was actually performing [his] job at a level that met [his] employer's legitimate expectations." *Id.*; *see also Miller v. Citizens Sec. Group, Inc.*, 116 F.3d 343, 346 (8th Cir. 1997). "The fact that an employee meets some expectations . . . does not mean that [he] meets the standard if [he] does not meet other significant expectations." *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir. 2002).

Defendants have produced specific evidence that Arraleh was not meeting their legitimate expectations. The record reveals that Arraleh had a history double-booking, missing, and appearing late at client appointments; leaving the office without signing out or informing his supervisor of where he was going; and poor customer service.[2] As a result, he was the subject of

---

[2] Defendants have offered evidence that Arraleh engaged in a similar pattern of behavior at prior and subsequent jobs. Arraleh asks the court to disregard this evidence as irrelevant and untimely disclosed. The Court has not considered this evidence.

at least two customer and four co-worker complaints during his six-month term, and his supervisor, Zurn, reprimanded him on several occasions. Specifically, Zurn reprimanded Arraleh twice in January 2002, for taking vacation and leaving the building without signing out. In addition, Zurn met with Arraleh on March 14, 2002, to discuss Arraleh's repeated behavior of double-booking, missing, and appearing late to appointments with clients. Zurn stated that he would need to take further action if Arraleh's performance did not improve and that in some businesses Arraleh's behavior would be grounds for dismissal. Nevertheless, on April 1, 2002, Arraleh again missed a client meeting.

Arraleh admits some of these deficiencies. However, he directs the Court to evidence that double-booking and missing appointments were common at Workforce Solutions and suggests that keeping appointments was therefore not a legitimate expectation at Workforce Solutions. According to Arraleh, when an Employment Guidance Counselor double-booked or missed an appointment, other Employment Guidance Counselors generally filled in for the unavailable Guidance Counselor. He offers affidavits of co-workers, one of whom avers that Guidance Counselors did this without complaint to their supervisor, Zurn. In his case, however, Arraleh's co-workers did not fill in for him and actually complained to Zurn about his performance.

That other employees gratuitously filled in for each other, but not Arraleh, does not excuse his poor performance. By Arraleh's own account, neither Zurn nor any other decisionmaker was aware of repeated incidents of missed or double-booked appointments by other employees. Thus, Arraleh has not presented sufficient evidence to raise a genuine issue of material fact as to whether keeping appointments was one of Defendants' legitimate expectations. Instead, it undisputedly was a legitimate expectation; Arraleh failed to meet it.

Arraleh has therefore failed to satisfy his prima facie case with respect to both his race and national origin discrimination claims, and the Court need not consider Defendants' remaining arguments regarding Arraleh's inability to establish a prima facie case of discrimination. Defendants are entitled to summary judgment on these claims.

*2.     Pretext*

Even assuming Arraleh could satisfy his prima facie case, Defendants have proffered a legitimate reason for their decision not to continue Arraleh's employment.  Namely, Defendants have presented evidence that the hired candidates did not have the unfavorable employment history at Workforce Solutions that Arraleh did.

Arraleh relies on the following evidence in an effort to demonstrate that Defendants' reason is a pretext for discrimination:  (1) Defendants' proffered legitimate reason has changed over time and therefore lacks credibility; (2) less qualified non-Somalians were hired for the positions for which Arraleh was rejected; (3) Zurn expressed an intent to let a list of eligibles expire before filling an open position, the effect of which was to eliminate Arraleh as a candidate for the position; and (4) various County employees made offensive comments.

Arraleh first argues that Defendants' proffered reason for not selecting Arraleh has changed during the course of this dispute and therefore lacks credibility.  As stated above, Defendants argue that they declined to hire Arraleh because he had an unfavorable employment history at Workforce Solutions, whereas the individuals hired for the open positions did not. Arraleh urges the Court to conclude that this reason is inconsistent with Zurn's earlier deposition testimony and his rejection letter to Arraleh, wherein Zurn stated that the reason Arraleh was not hired was because the education and work experience of the other candidates best fit the requirements of the open positions.

"While it is true that substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext, this does not mean that an employer cannot elaborate on its proffered reason." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005) (internal citations and quotations omitted). Defendants have not disavowed their statement that the education and work experience of the hired candidates best fit their employment needs. Rather, they have simply elaborated on those aspects of the hired candidates' work experience that made them better qualified for the positions Arraleh sought. Defendants' reason has not changed over time.

Arraleh next argues that Defendants' proffered reason for not selecting him for the open positions lacks credibility in light of the fact that the individuals hired for the positions were not as qualified as him. Arraleh asserts that he had a better educational background, a longer and more relevant work history, and significantly greater language skills than either employee hired for the two Employment Guidance Counselor Aide positions for which he was rejected.[3] Defendants do not dispute these assertions, but proffer evidence that Arraleh was not meeting their legitimate expectations. As described above, Arraleh had a history of double-booking, missing, and appearing late to client appointments; leaving the office without signing out or informing his supervisor of where he was going; and poor customer service. The candidates hired for permanent positions did not have these performance problems. Defendants could legitimately prefer employees who had positive work histories without running afoul of the anti-

---

[3] Although Arraleh alleges that candidates hired later for positions other than the Employment Guidance Counselor Aide positions were not minimally qualified, he offers only the bald contentions of Employment Guidance Counselors Loretta Novak and Donna Waldhauser in support of his allegations. Neither Novak nor Waldhauser have the requisite foundation to make these assertions. Furthermore, the record is undisputed that at least one of the employees subsequently hired for an open Employment Guidance Counselor position, Rhodes, appeared on the same list of eligibles as Arraleh.

discrimination laws. The Court does not "sit as a super-personnel department, second-guessing employment decisions." *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 757-58 (8th Cir. 2003) (internal quotations omitted).

Arraleh also argues that Zurn elected to let an eligibility list upon which Arraleh appeared to expire, notwithstanding the fact that Workforce Solutions had a need for additional permanent employees. He contends that this is evidence of discriminatory motive. Arraleh's argument lacks merit for several reasons. First, it is undisputed that when Arraleh first appeared on the list of eligibles, he was interviewed. He was, in other words, given an opportunity to compete for a permanent position. He was simply not chosen. Second, assuming, as the Court must, that Zurn expressed his intent to let the eligibility list upon which Arraleh's name appeared expire, Arraleh has not offered any evidence that Zurn followed through with his expressed intent. Arraleh has not, for example, offered any evidence of what positions were allegedly open, when they were filled, or by whom they were filled. Accordingly, the Court rejects Arraleh's contention that Zurn's expressed intent is evidence of pretext.

Finally, Arraleh seeks to demonstrate that Defendants' decision not to hire him was motivated by discrimination by pointing to comments made by Workforce Solutions employees. Although Arraleh has presented evidence that his co-workers made several offensive comments to him or in his presence, he has identified only two comments regarding race or national origin made by decisionmakers. As discussed above, Arraleh alleges that Zurn stated to Waldhauser that he found it difficult to work with black men. As presented, however, this comment is inadmissible hearsay. Moreover, Arraleh has not presented any evidence that Zurn, who hired Arraleh knowing that Arraleh was a black Somalian immigrant, had suddenly developed an aversion to black Somalians less than six months later. *Cf. Miller*, 116 F.3d at 348; *Herr v.*

*Airborne Freight Corp.*, 130 F.3d 359, 362-63 (8th Cir. 1997) ("There is strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time.").

The only other comment regarding race or national origin Arraleh alleges was made by a decisionmaker is a comment made by Brady to the effect that black people were expected to "leave their blackness behind" at the workplace. The statement was not, however, made in the context of a hiring decision. Thus, the comment, like those made by non-decisionmakers, was a stray comment in the workplace and is, therefore, not sufficient to demonstrate discriminatory motive in hiring. *See Calder*, 298 F.3d at 730. In fact, the record is undisputed that Brady approved the decision to hire Gates, Mays, and Rhodes for the positions Arraleh sought; all three of these candidates were black. Accordingly, the Court rejects Arraleh's assertion that comments made by Workforce Solutions employees demonstrate that the decision not to hire Arraleh was motivated by discrimination.

**B.     Hostile Environment**

Next, Arraleh asserts that he was subjected to a hostile work environment. To establish a hostile work environment claim, Arraleh must demonstrate that:  (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) employer liability. *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). To alter the terms and conditions of one's employment, conduct must be severe and pervasive, both objectively and subjectively. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005). When determining whether a work environment is hostile or abusive, a court examines all of the circumstances, including the frequency of the discriminatory conduct;

11

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Al-Zubaidy*, 406 F.3d at 1038. Harassment standards are demanding. *Id.* Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* at 1039.

In this case, Arraleh complains that various (often unidentified) co-workers made offensive comments to and/or about him, including the following: "Today, your skin doesn't look as white as it normally does"; "It's difficult to work with you people"; "You are always late"; "You people are so emotional, is your culture always like this?"; "The reason you people never get jobs is because you are always listening to loud music"; "Employers never call back you people"; "I don't think you do as much work as we do"; "Is your hair for real?"; "Giving Rashid a job is like raising terrorist kids"; and calling Arraleh "Mr. Cocoa," "little," "cute," "the beautiful one," "lazy," and "stupid." In addition, Arraleh has presented evidence that Donna Waldhauser heard disparaging comments about Muslims and African immigrants throughout her employment at Ramsey County.

Many of the comments about which Arraleh complains, including the evidence that co-workers called him "little," "cute," and "the beautiful one," have no apparent connection to his race or national origin. Other comments, including all but one offensive comment identified by Waldhauser, were not directed at Arraleh or made in his presence. *See Singletary*, 423 F.3d at 893. While some comments made directly to Arraleh or in his presence were offensive, Arraleh has not presented evidence that those comments were sufficiently severe or pervasive to alter the terms or conditions of his employment. *See id.* ("We have held that racial slurs alone do not

12

render a work environment hostile as a matter of law."). Accordingly, the Court grants Defendants' motion for summary judgment on Arraleh's hostile work environment claims.

**C.    Retaliation**

Finally, Arraleh alleges that Defendants' decision not to hire him for continued employment was done in retaliation for his complaint to Brady that he was being discriminated against based on his race and that he was experiencing a hostile work environment. Arraleh's retaliation claims are analyzed under the analysis set forth in *McDonnell Douglas. See Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005); *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 548 (Minn. 2001). To establish a prima facie case of retaliation, Arraleh must demonstrate that:  (1) he engaged in statutorily-protected conduct; (2) he experienced an adverse employment action; and (3) a causal connection exists between Arraleh's protected conduct and the adverse action. *See Eliserio*, 398 F.3d at 1078-79; *Hoover*, 632 N.W.2d at 548. Defendants concede that Arraleh experienced an adverse employment action by not being hired for continued employment. They argue, however, that Arraleh has not established the remaining two elements of his prima facie case.

Defendants first argue that Arraleh did not engage in protected activity. Acknowledging that Arraleh complained to Brady approximately two weeks prior to the expiration of his employment that he was suffering a hostile work environment, Defendants argue that Arraleh's complaint was insufficiently precise to qualify as a protected activity. The Court disagrees. Although Arraleh's written complaint to Brady lacks precision, his complaint unambiguously communicated that, in Arraleh's opinion, Defendants were fostering a racially hostile work environment. Moreover, Patricia Brady sent an e-mail to Human Resources Generalist George Hamm after her meeting with Arraleh, wherein she reported that Arraleh had complained that he

was "not being given an opportunity at employment because of his color" and that he believed that "he has been treated differently [at Workforce Solutions] because of his race." Arraleh has therefore satisfied his burden of demonstrating that he engaged in protected conduct.

Next, Defendants argue that Arraleh has not come forward with any evidence tending to establish a causal connection between his protected conduct and their decision not to hire him for continued employment. Arraleh responds by offering evidence that only three weeks elapsed between the time he made his protected complaint to Brady and Defendants' decision not to hire him for the Employment Guidance Counselor Aide positions; that after Arraleh complained to Brady on May 22, Brady and Zurn requested advice from Human Resources Generalist Hamm before interviewing Arraleh; and that Brady and Zurn began a course of retaliation against a third party, Donna Waldhauser, after she participated in an interview with Defendants' counsel in connection with this case.

The record reveals that Arraleh was not meeting Defendants' performance expectations and was reprimanded accordingly on several occasions prior to the time he made his complaint to Brady. This evidence undermines Arraleh's attempt to demonstrate a causal connection. *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 503 (8th Cir. 2005); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004). In addition, Defendants continued to consider Arraleh's application for employment after becoming aware that Arraleh had lodged a complaint. Human Resources Generalist Hamm instructed Zurn and Brady that, Arraleh's complaint notwithstanding, they should treat Arraleh like any other candidate. Arraleh has not presented any evidence that Zurn or Brady disobeyed this instruction. In sum, Arraleh has failed to demonstrate a causal connection between his protected conduct and an adverse employment

action. Accordingly, the Court grants Defendants' motion for summary judgment on Arraleh's retaliation claims.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' motion for summary judgment [Docket No. 28] is GRANTED.

2. Defendants' motion for sanctions [Docket No. 35] is DENIED AS MOOT.

3. Arraleh's Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  November 18, 2005

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge
